Filed 5/22/14  In re V.F. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re V.F., a Person Coming Under the Juvenile Court Law. | D064874 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JORGE O.,<br><br>Defendant and Appellant. | (Super. Ct. No. SJ12618A) |

APPEAL from orders of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Sahyeh S. Riopelle, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Jorge O. appeals orders denying his request for presumed father status, denying his petition for modification under Welfare and Institutions Code section 388,[1] and terminating his parental rights to his minor daughter, V.F. He also argues the juvenile court improperly required a section 388 modification petition to address a due process violation based on inadequate notice and that the lack of notice mandated automatic reversal of the court's prior orders. We affirm the orders.

## FACTUAL AND PROCEDURAL BACKGROUND

Jorge is the biological father of now 12-year-old V.F. As a teenager, V.F.'s mother, Crystal F., gave birth to V.F. in Ponce, Puerto Rico. Before V.F.'s birth, and for a time after, Crystal lived with Jorge's mother in Ponce, while Jorge lived and worked in Florida. Jorge visited Crystal at his mother's home for two weeks when V.F. was born. Before V.F.'s first birthday, Crystal and V.F. left Ponce to live with Crystal's father in Los Angeles, California.

When Crystal was 17, her father was arrested and she became a dependent of the Los Angeles County Juvenile Court. A voluntary dependency case was opened for V.F. at that time, but she was not made a dependent of the court. Crystal's own dependency proceeding was closed after she turned 18. Thereafter, she lived a transient lifestyle alternating between living in Los Angeles, San Diego, and Mexico. Throughout V.F.'s life, Crystal had frequent run-ins with child protective services, but V.F. and Crystal's younger two children, J.G. and Miguel G., Jr., remained in Crystal's care.

In 2010, Crystal, J.G. and Miguel, Jr., moved to Rosarito, Mexico, with the younger children's father, Miguel G., Sr. Crystal left V.F. with a friend in Los Angeles to finish the

_____

[1] Statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

school year. V.F. was traumatized by being left alone in the United States and eventually Crystal came back to take V.F. to Rosarito. In early 2011, Crystal moved back to San Diego to avoid losing benefits she was receiving, leaving the three children with Miguel, Sr., in Rosarito. Shortly thereafter, Miguel, Sr., abruptly left Rosarito for Zacatecas, Mexico.

In June 2011, the Mexican social service agency, Desarrollo Integral de la Familia (DIF) received reports the family's home was in unlivable condition and Crystal was abusing drugs. DIF removed V.F., J.G., and Miguel, Jr., from the home and placed them in a shelter in Tijuana. DIF workers found the family's trailer in deplorable condition. It had no running water, food, refrigerator, stove, electricity, or bathroom. Feces littered the trailer's floor. In July, DIF contacted the international liaison of the San Diego County Health and Human Services Agency (Agency) and the children were expatriated to the United States and placed at Polinsky Children's Center. Crystal's whereabouts were unknown at the time.

The Agency filed a petition in the juvenile court under section 300, subdivisions (b) and (d) on behalf of V.F. alleging Crystal was unable to protect or provide adequate care for V.F. and that V.F. had been sexually abused by Miguel, Sr.[2] In interviews with the Agency's social workers, V.F. reported that Crystal abused marijuana and methamphetamine in her presence. V.F. also told social workers she was physically and sexually abused by Miguel, Sr., and sexually abused by another adult male who lived in the garage of a prior family home in Los Angeles. V.F. told DIF's social worker this man raped her repeatedly and gave her a sexually transmitted disease. V.F. also reported she witnessed physical violence between Crystal and

---

[2]     Petitions were also filed on behalf of J.G. and Miguel, Jr. Crystal and Miguel, Sr.'s, parental rights were ultimately terminated as to these minors. They are not subjects of this appeal.

3

Miguel, Sr., including episodes in which Miguel, Sr., cut Crystal with an ice pick and threw a pan with hot oil at her. As a result of the abuse, V.F. was referred to Rady Children's Hospital's Trauma Focused Counseling.

The Agency located Crystal before the detention hearing and she identified Jorge as V.F.'s father. Crystal stated she had not been in contact with Jorge for over 10 years and did not have his address or telephone number. Though not known to the Agency at the time, the middle name Crystal provided for Jorge was incorrect. DIF provided the Agency with V.F.'s birth certificate, which listed Ponce as V.F.'s place of birth and did not list any father.

At the detention hearing, a Parentage Inquiry form was completed for Crystal that listed "George" O. as V.F.'s father and stated that at Jorge's request genetic testing had been done confirming Jorge was V.F.'s father. She provided a birth date for Jorge (which later proved incorrect), but not an address or phone number. Crystal and Jorge were never married and neither Crystal nor V.F. had lived with him at his home, but Jorge had "provided baby supplies before" V.F.'s birth. At the hearing, the juvenile court ordered the Agency to conduct a reasonable search to locate and notify Jorge of the proceedings.

For the jurisdiction hearing, the Agency reported Crystal had not provided sufficient information to conduct a search for Jorge. In the same report, the Agency stated V.F. believed her father still lived in Puerto Rico. At the contested jurisdiction hearing, the juvenile court made a finding that reasonable search efforts were made to locate and notice V.F.'s father. The court also assumed jurisdiction over V.F., J.G., and Miguel, Jr., and declared them dependents of the juvenile court. The court removed the three children from Crystal's care and ordered the Agency to provide reunification services to Crystal. The children were placed together in a

4

licensed foster home. A month later, Crystal gave birth to another child, Bella G. In a separate proceeding, Bella was declared a dependent of the juvenile court and was placed in the same foster home as V.F., J.G., and Miguel, Jr.

For the six-month review hearing in February 2012, the Agency reported it submitted an updated parent search request for Jorge and that the last search failed to obtain an address for him. At the review hearing, the juvenile court found notice had been given as required by law. Because Crystal had visited the children regularly and participated in services, the court continued reunification services. For the 12-month review hearing, the Agency made the same report it had made for the six-month review concerning its efforts to locate Jorge. The juvenile court again found notice had been given as required by law and ordered the continuation of reunification services for Crystal. In this time frame, V.F. and her half siblings were moved from their initial foster home to a prospective adoptive home.

In November 2012, counsel for V.F. and her half siblings filed a section 388 petition seeking to terminate Crystal's services and set a permanency planning hearing. Crystal had failed to participate in services, had not visited with the children, and had been arrested. The Agency's report for the hearing on the petition stated a parent search for Jorge could not be completed because they did not have a known city in which to conduct the search. The report also stated Crystal believed Jorge could be in Florida or Puerto Rico, but that she could not provide a specific city. The juvenile court held an evidentiary hearing on the modification petition in January 2013. The court terminated reunification services and set a permanency planning hearing for May 2013. Although the court had ordered minors' counsel to provide

notice to the parents when it set the evidentiary hearing on the petition, the court made no notice findings with respect to Jorge in its order.

Beginning in January 2013, V.F., who had been seeing a therapist regularly since September 2012, began to show improvement in both her emotional health and her progress at school. The night terrors and emotional outbursts she suffered from lessoned, and she stopped anxious nail biting that had often left her fingers bleeding. Then, in May 2013, Crystal requested to see the children. A visit was scheduled for the next month so that V.F. could first finish the school year. By the time of the visit, the children had not seen Crystal for almost a year. When V.F. was told she would be seeing Crystal, she became extremely emotional and anxious.

Crystal failed to show up for the visit and, as a result, V.F. experienced an emotional set back. Her night terrors and nail biting returned. She also began acting out more at home and became depressed and withdrawn at school. The minors' counsel filed another section 388 petition on behalf of V.F. and her half siblings, this time seeking to terminate all visitation with Crystal. V.F.'s therapist submitted a letter in support of the petition describing V.F.'s behavior. In the therapist's opinion, visitation with Crystal or the introduction of Jorge into V.F.'s life would only cause further trauma.

In April 2013, an Agency search clerk located an address for Jorge in Ponce and sent a letter there. Jorge responded immediately and the Agency obtained a continuance of the permanency planning hearing to provide Jorge with notice. Once in contact, Jorge immediately expressed his desire to bring V.F. to Ponce to live with him and his wife. Jorge also requested an attorney and to be kept informed of the proceedings.

6

Jorge told the Agency's social worker he had last seen V.F. after her birth and had only received sporadic phone calls and text messages from Crystal since then. Jorge said that he sent money to Crystal for V.F. when she was young, but stopped at Crystal's request so that she would be eligible for governmental assistance. Jorge had two other children from a previous marriage who resided in the United States with their mother and he and his current wife were expecting a baby in the fall.

Counsel was appointed for Jorge, who requested Jorge's parental status be elevated from an alleged father to a presumed father under Family Code section 7611, subdivision (d) or, alternatively, under *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 (*Kelsey S.*).[3] Jorge and V.F. also completed genetic testing confirming Jorge was V.F.'s biological father. Jorge then filed a motion to set aside the juvenile court's reasonable search effort finding at the jurisdiction hearing and all subsequent orders, arguing his due process rights were violated by the Agency's failure to make an adequate effort to locate him. The Agency opposed the motion, arguing the proper vehicle to challenge the court's orders was a section 388 petition for modification. At a special hearing on the motion, the court agreed with the Agency and required Jorge to file a section 388 petition to address the alleged due process violation.

Jorge filed the petition that day, again requesting the juvenile court set aside its prior reasonable search efforts finding, all other notice findings made as to him, and that the court order a new jurisdiction and disposition hearing. The court found Jorge had made a prima facie showing of changed circumstances and best interests and set an evidentiary hearing on his

---

[3] As a result of the appointment of conflict counsel for Jorge, the case was transferred to a different courthouse and new judge.

petition and on his presumed father request. The hearing was set for the same day as the delayed permanency planning hearing.[4]

At the multi-day hearing in September, the court received into evidence the Agency's reports; Jorge and Crystal's parentage inquiries;[5] Jorge's initial motion, section 388 petition, and trial brief; the Agency's service logs; and the stipulated testimony of the Agency's social worker, the search clerk who located Jorge, and V.F.'s prospective adoptive parent. V.F.'s therapist and Jorge also testified, both by phone.

V.F.'s therapist testified V.F. had not been told that Jorge wanted to establish a relationship with her, but that V.F. had told the therapist she did not remember him. In her stipulated testimony, V.F.'s prospective adoptive mother stated V.F. told her she had talked to Jorge one or two times in the past and that V.F. believed Jorge was a police officer and had seen a picture of him in uniform. The Agency's report for the jurisdiction hearing also stated V.F., who was nine years old at the time, told a social worker "most of [her] family resides in Puerto Rico" and "she would like to live there . . . ."

The therapist and the prospective adoptive mother both described the emotional toll the trauma V.F. experienced in Crystal's care had taken, and the recent negative turn in V.F.'s behavior after Crystal's missed visit. The therapist reiterated her belief, outlined in her letter

---

4    The minors' section 388 petition concerning Crystal's visitation was also set for the same day.

5    A second Parentage Inquiry form was completed for Crystal before the hearing. In the second form, the answers were revised to state that Jorge lived with Crystal and V.F. for two weeks after V.F.'s birth and that when Crystal told Jorge he was V.F.'s father he "got happy." The initial form reported Jorge questioned that he was the father and asked for a paternity test. The second form also added that Jorge claimed V.F. as his own by calling her and sending Crystal "a last name request form."

8

accompanying the minors' section 388 petition, that reintroduction of either Crystal or Jorge into V.F.'s life would be very destabilizing for V.F. and her younger half siblings. The therapist also opined that V.F. had a strong bond with her prospective adoptive mother and her younger half siblings.[6] She was hesitant to recommend a delay in the proceedings to allow Jorge to attempt to form a relationship with V.F., especially in light of these important bonds.

Jorge testified in Spanish through an interpreter. He confirmed he visited Crystal at his mother's home in Ponce for two weeks when V.F. was born, but had not seen either Crystal or V.F. since then. He sent money to Crystal for V.F. on a monthly basis until Crystal left Ponce when V.F. was six months old. Crystal resumed contact with Jorge when V.F. was three and he sent Crystal 200 pesos a month through Western Union until V.F. was five. Jorge testified that during this time period he met with an attorney in Florida to try to obtain custody of V.F., but was told he needed more information about Crystal and V.F.'s whereabouts to proceed. Jorge then lost contact with Crystal again. The next time he heard from Crystal was in 2010. Jorge stated he spoke with V.F. on the phone and she told him she wanted to come to Puerto Rico, where he was living, to visit him. Jorge asked V.F. where she lived, but claimed she would not tell him. Jorge also testified his uncle was married to Crystal's aunt, and he occasionally asked the aunt about Crystal and V.F.

Jorge testified he had always wanted a relationship with V.F. and now saw an opportunity for her to live with him and his wife. Since learning of the dependency proceeding, he had attempted to have contact with V.F. and asked for pictures of her. Jorge was prepared to care for V.F. and she would have her own room in his house. He worked full

---

[6] The prospective adoptive mother was committed to adopting all four children.

9

time as a security officer and his wife worked full time at a hospital. He testified he was aware of V.F.'s mental health needs and had extended family that would help care for V.F. Jorge had also chosen a school and obtained a therapist for V.F. in Ponce.

The stipulated testimony of the social worker concerning the Agency's initial searches for Jorge was that the initial search request did not identify Ponce as a possible location. The social worker also stated she had submitted an additional search request in August 2012, but to her knowledge the Agency did not complete a search or declaration of due diligence.

After the trial concluded, the juvenile court found Jorge had not met his burden to show he was a presumed father under either Family Code section 7611, subdivision (d) or *Kelsey S.*, and deemed him a biological father. The court found that it was undisputed Jorge held V.F. out as his own, but that he did not receive her into his home. Rather, Jorge was a visitor in his mother's home at the time Crystal and V.F. lived there. With respect to Jorge's claim he was entitled to presumed father status under *Kelsey S.*, the court found he did not promptly come forward or demonstrate a commitment to his parental responsibilities.

On Jorge's section 388 petition, the juvenile court found that although Jorge demonstrated changed circumstances based on the evidence of the Agency's deficient search efforts, he had not established it would be in V.F.'s best interests to reverse the prior orders and delay the proceedings for the purpose of allowing Jorge to attempt to develop a relationship with V.F. The court highlighted the fact that Jorge was involved now only because the Agency finally located him; he took no action to locate V.F. himself. The court further found that because of the trauma V.F. had experienced there was a great potential for harm to V.F. if she

10

were removed from her current home. The juvenile court denied Jorge's petition and followed the Agency's recommendation to terminate the parental rights of both Jorge and Crystal.

DISCUSSION

I

Jorge contends the court erred by denying his request for presumed father status. He asserts he adequately showed he was deserving of such status within the meaning of Family Code section 7611, subdivision (d), or alternatively, under *Kelsey S.*

A

The extent to which a father may participate in dependency proceedings and a father's rights in those proceedings depends on his parentage status. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1209.) Only presumed fathers are entitled to all the rights afforded to parents, including reunification services and custody (absent a finding of detriment). (§§ 317, subd. (b), 361.2, subd. (a), 361.5, subd. (a); *In re Zacharia D.* (1993) 6 Cal.4th 435, 448-449; *In re T.R.*, at p. 1209.) A presumed father is defined under the provisions of the Uniform Parentage Act of 1973 (Fam. Code, § 7600 et seq.).

Paternity presumptions are driven not by biology, "but by the state's interest in the welfare of the child and the integrity of the family." (*In re T.R., supra*, 132 Cal.App.4th at p. 1209; *In re Nicholas H.* (2002) 28 Cal.4th 56, 65.) In the context of dependency proceedings, a presumed father is one who promptly comes forward and shows a full commitment to his parental responsibilities—emotional, financial and otherwise. (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802; see also *Kelsey S., supra,* 1 Cal.4th at p. 849.) "The presumed father's commitment to the child is a key consideration." (*In re T.R.*, at p. 1210.)

11

A man may achieve presumed father status when he "receives the child into his . . . home and openly holds out the child as his . . . natural child." (Fam. Code, § 7611, subd. (d).) In determining whether this provision applies, the court considers factors such as whether the man promptly took legal action to obtain custody of the child; whether and how long he cared for the child; whether there is unequivocal evidence he acknowledged the child as his and to what extent he did so; and whether his care of the child was merely incidental. (*In re T.R., supra,* 132 Cal.App.4th at p. 1211.) The criteria for achieving presumed father status is not viewed in a vacuum. (*Ibid.*) Thus, even a man who receives a child into his home and holds the child out as his own will not necessarily qualify as a presumed father if he has acted in a manner incompatible with parenthood. (*Ibid.*)

If a third party thwarts a biological father's attempts to achieve presumed father status under Family Code section 7611, subdivision (d), he may still attain presumed father status if he has made "a full commitment to his parental responsibilities--emotional, financial, and otherwise . . . ." (*Kelsey S., supra,* 1 Cal.4th at p. 849.) In *Kelsey S.*, the California Supreme Court held the parental rights of a biological father who had made timely efforts to fulfill his parental responsibilities could not be terminated without a finding he was unfit. (*Ibid.*) To gain this presumption, a father must demonstrate a full commitment to parental responsibilities within a short time after he learns the biological mother is pregnant with his child and must demonstrate a willingness to assume full custody of the child. (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1060; *Kelsey S.*, at p. 849.)

A man seeking presumed father status, under either Family Code section 7611, subdivision (d) or *Kelsey S.* has the burden of establishing the foundational facts by a

12

preponderance of the evidence. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652.) We review the juvenile court's determination for substantial evidence. (*Id*. at pp. 1650, 1653; *In re J.H.* (2011) 198 Cal.App.4th 635, 646.) In this regard, we do not consider the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence. Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is substantial evidence supporting a contrary finding. (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 599-600; *In re Spencer W.*, at p. 1650.) The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

B

The juvenile court found Jorge did not meet the statutory requirement of receiving V.F. into his home. Rather, the court found Jorge was merely a visitor in his mother's home at the time of V.F.'s birth. On appeal, Jorge contends the court's ruling was based on an overly strict interpretation of the statute. He argues it was error for the court to require he receive V.F. into his *own* home, and that his receipt of V.F. into his mother's home in Ponce was sufficient.

We disagree. Substantial evidence supports the court's finding Jorge did not meet the requirement that he receive V.F. into his home. Rather, V.F. was received into Jorge's mother's home. Although Jorge was raised in the home, he left his mother's house when he was 22 years old, then moved to Florida two years later. Jorge did not return to live in Ponce until 2008. Jorge's own testimony was that he visited when V.F. was born, not that he moved back

13

into his mother's home. He stated he took time off from his job in Florida as a school custodian for the birth, and stayed only two weeks. Jorge has not seen V.F. since that time.[7]

Sufficient evidence also supports the juvenile court's finding that Jorge was not entitled to presumed father status under *Kelsey S.* Jorge's attempts to locate V.F. were meager and he failed to maintain contact with her, only showing an interest in establishing a parental relationship once contacted by the Agency. Jorge testified he did not know how to locate V.F., and therefore was thwarted in his attempt to seek custody. However, he sent Crystal money for a period through Western Union, which required at least some knowledge of Crystal and V.F.'s whereabouts. He also stated his uncle was married to Crystal's aunt, showing an additional avenue of information. Despite these connections to V.F., Jorge took little initiative to become part of her life over the years. These facts sufficiently support the court's determination that

---

[7]    The cases Jorge cites do not support his contention that the facts here meet the statute's receipt requirement. *S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023 and *In re A.A.* (2003) 114 Cal.App.4th 771 both involved situations where the presumed parents had demonstrated a full commitment to parenting their children and had established strong parental bonds despite unconventional living arrangements. (See *S.Y. v. S.B.,* at p. 1032 [The presumed parent owned her own separate residence but spent the majority of her time in the family home]; *In re A.A.,* at pp.784, 783 ["Although the minor was not received into [the presumed father's] home . . . on a full-time basis, he was involved with the minor from the very beginning," including visiting the minor every weekend, and on holidays and birthdays, and providing financially for the minor's needs.].) In contrast to these cases, Jorge has not seen V.F. since she was two weeks old and has spoken with her on the phone once.

*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361 involved a same-sex couple who *lived* together at the time their daughter was born. (*Id*. at p. 366.) Jorge merely visited Crystal and V.F. one time at V.F.'s birth.

Jorge did not demonstrate a commitment to parenting V.F. and, therefore, was not entitled to presumed father status.[8]

## II

Jorge next contends the juvenile court erred by requiring the alleged violation of his due process rights be considered within the structure of a section 388 petition. He argues the Agency's failure to conduct an adequate search constituted a structural error requiring automatic reversal. Alternatively, he contends the error was not harmless beyond a reasonable doubt. Finally, Jorge argues that even if the court's requirement he file a section 388 petition was appropriate, V.F.'s best interests would be served by returning to the jurisdictional phase of the proceedings.

This case illustrates the severe problems that are created by the Agency's failure to conduct a diligent search for a missing parent at the outset of a dependency proceeding. Jorge's appeal pits his right to notice squarely against the best interests of V.F. Although it is a difficult determination, we conclude the due process violation committed against Jorge does not override the state's interest in providing V.F. with a permanent, stable home, with a caregiver and half siblings she is bonded to, without undue delay.

## A

Initially, we reject Jorge's contention the juvenile court erred by requiring him to file a section 388 petition to address whether the lack of notice required the court to set aside its prior orders. "A section 388 motion is a proper vehicle to raise a due process challenge based

---

[8] Because we uphold the juvenile court's finding that Jorge was not a presumed father, his argument that the juvenile court erred by terminating his parental rights without a finding of unfitness is moot.

on lack of notice." (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) While we agree with Jorge that the juvenile court has the inherent authority to set aside its prior orders, the statutory mechanism provided by the code is preferred.[9] (See *Nickolas F. v. Superior Court* (2006) 144 Cal.App.4th 92, 111 ["A statutory mechanism is the preferred means by which to modify a prior order of the court."].) In addition, regardless of the procedural mechanism by which the court considers a due process challenge, the minor's best interests are of paramount concern in every dependency proceeding. (§§ 202, subd. (d), 245.5, 300.2.)

The juvenile court found the Agency's initial efforts to locate Jorge were insufficient and, as a result, he was not provided with notice of the jurisdiction, disposition or subsequent review hearings. The Agency concedes this point. Although the inadequacy of the Agency's search efforts is undisputed, we must nevertheless determine the effect of that error, in this case within the framework of section 388. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222 [where question is one of law, we review claimed constitutional violation de novo]; *In re J.H.* (2007) 158 Cal.App.4th 174, 183 [notice errors reviewed de novo].)

Jorge argues the error was "structural" and mandates automatic reversal. "[T]he structural error doctrine that has been established for certain errors in criminal proceedings" is not "imported wholesale, or unthinkingly, into the quite different context of dependency cases." (*In re James F.* (2008) 42 Cal.4th 901, 915-916.) Under the unique facts presented here, we decline to find the inadequacy of the Agency's initial search constituted a structural error. In this case, Jorge did eventually receive notice of the proceedings and the opportunity

---

9    Contrary to Jorge's contention, Code of Civil Procedure section 473, subdivision (d) does not apply to dependency proceedings. (*David B.* (1994) 21 Cal.App.4th 1010, 1017.)

to participate and attempt to elevate his parental status. Therefore, we conclude the lack of compliance with notice requirements did not render the juvenile court's prior orders void in the absence of prejudice. (See *In re J.H.*, *supra*, 158 Cal.App.4th at p. 183 ["errors in notice do not automatically require reversal but are subject to the harmless beyond a reasonable doubt standard of prejudice"]; *In re Jesusa V.* (2004) 32 Cal.4th 588, 625 [goal of resolving dependency actions expeditiously would be thwarted if proceeding had to be redone without a showing the new proceeding would have a different outcome]; *In re James F., supra,* 42 Cal.4th at p. 918 [procedural errors in dependency cases should not automatically be treated as structural defects requiring automatic reversal].)[10]

### B

As both parties point out, it is simply not possible to know what the outcome would have been if the Agency conducted a diligent search for Jorge at the outset of the proceeding. Placing emphasis on the minor's best interests and Jorge's status as a biological (not a presumed) father, we conclude the due process violation was harmless beyond a reasonable doubt.

Because Jorge was not a presumed father his right to establish a relationship with V.F. was limited. (See *In re Sarah C.* (1992) 8 Cal.App.4th 964, 972 ["the father's rights flow from his relationship (or attempted relationship) to the mother and/or child and not merely from his

---

[10]    (Cf. *In re Jasmine G.* (2005) 127 Cal.App.4th 1109, 1116 [error was reversible per se where Agency never attempted to give mother notice of selection and implementation hearing at which her parental rights were terminated despite knowing her address and having repeated contact with her]; *In re Claudia S.* (2005) 131 Cal.App.4th 236, 250-251 [reversible error where court conducted all hearings, then terminated reunification services, without any notice to the parents or children, all of whom were out of the country].)

status as the biological father"].) "When an unwed father demonstrates a full commitment to the responsibilities of parenthood by '[coming] forward to participate in the rearing of his child,' [citation], his interest in personal contact with his child acquires substantial protection under the Due Process Clause. At that point it may be said that he '[acts] as a father toward his children.' [Citation.] But the mere existence of a biological link does not merit equivalent constitutional protection." (*Lehr v. Robertson* (1983) 463 U.S. 248, 261.)

If the biological father grasps the opportunity to develop a relationship with the child and "accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie." (*Lehr v. Robertson, supra*, 463 U.S. at p. 262; see also *Dawn D. v. Superior Court* (1998) 17 Cal.4th 932, 943 ["[T]he biological father of a child born to a woman married to another man has no liberty interest in establishing a relationship with the child."].)

As evidenced by the juvenile court's finding that Jorge was not a presumed father, Jorge failed to grasp his opportunity to become a parent to V.F. Jorge had ample opportunity to take a more active role in V.F.'s life. He maintained sporadic contact with Crystal, but never took any step to see V.F. Jorge testified that when he was living in Florida, he contacted an attorney but was told he needed more information to pursue custody of V.F. However, in the same time period he stated he was sending Crystal small sums of money for V.F., indicating he had at least knowledge of their location. He also had a connection to V.F. through his uncle's marriage to Crystal's aunt, but once he lost contact with Crystal he failed to use this connection

18

to locate V.F. Jorge's right to an opportunity to develop a relationship with V.F. was, therefore, minimal.[11]

The juvenile court found that delaying the termination of parental rights in order to provide Jorge with an opportunity to form a relationship with V.F., a man she had never really known, was not in V.F.'s best interests. Jorge presented no evidence suggesting a different finding would have been made had he appeared earlier. As a mere biological father, Jorge was not entitled under the dependency statutes to reunification services or custody (absent a finding of detriment). (§§ 317, subd. (b), 361.2, subd. (a), 361.5, subd. (a); *In re Zacharia D., supra,* 6 Cal.4th at p. 448; *In re T.R., supra,*132 Cal.App.4th at p. 1209.) While it would have been within the juvenile court's discretion to provide reunification services and placement to Jorge had he been present at the beginning of the proceeding, there was no requirement they be provided. If services were not provided to Jorge, the case would have proceeded the same and there is no prejudice. Even if services had been provided, the likelihood Jorge would have ultimately obtained custody of V.F. is too small to warrant a finding of prejudice.

At the start of the proceedings, V.F. was a severely traumatized child with substantial emotional needs. Crystal was initially successful with her case plan and her reunification with

---

11      In all but one case that Jorge relies on where defects in notice resulted in a reversal, the parents whose rights were at issue were mothers or presumed fathers. (See *In re Justice P., supra,* 123 Cal.App.4th at p. 187 [presumed father]; *In re Jasmine G., supra,* 127 Cal.App.4th at p. 1112 [mother]; *In re Claudia S., supra,* 131 Cal.App.4th at p. 241 [mother and presumed father]; *In re DeJohn B.* (2000) 84 Cal.App.4th 100, 102 [mother]; *In re B.G.* (1974) 11 Cal.3d 679, 682 [mother].) In the one case that did not involve a presumed father or mother, *Ansley v. Superior Court* (1986) 185 Cal.App.3d 477, the father's status was not set forth in the opinion and the merits of his claimed due process violation were not before the court. Rather, the appellate court issued a writ of mandate directing the juvenile court to vacate its order refusing to hear the father's section 388 petition based on lack of notice and to proceed to the merits of his petition. (*Id*. at p. 491.)

V.F. seemed probable. Jorge provided no evidence he would have sought custody of V.F. in 2011 when she was detained or that he would have been able to care for her at that time, especially in light of the emotional turmoil that was created by her abuse. Jorge testified he moved back to Ponce in 2008 but, until 2012, had custody of his two other children. He did not state if he was employed at that time, what his housing was like then, or whether he could have adequately cared for V.F. In light of this evidence, we conclude the Agency's failure to provide notice to Jorge at the outset of the case was harmless.

## C

It follows that the juvenile court did not abuse its discretion in finding that returning the case to the jurisdictional stage in order to provide Jorge with the opportunity to establish a relationship with V.F. was not in her best interests. Under section 388, the party petitioning the court to set aside a previous order has the burden of showing, by a preponderance of the evidence, there is a change of circumstances or new evidence, and the proposed change is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415-416.)

Whether setting aside a previous court order is in the child's best interests is a question within the sound discretion of the juvenile court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The order will not be disturbed on appeal unless the court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. When two or more inferences reasonably can be deduced from the facts, we have no authority to reweigh the evidence or substitute our decision for that of the juvenile court. (*In re Stephanie M.*, at pp. 318-319.) In ruling on a modification

20

petition, the court may consider the entire factual and procedural history of the case. (*In re Justice P., supra,* 123 Cal.App.4th at p. 189.)

At the time V.F. was taken into protective custody, she had been severely abused and was in dire need of protection. More than a year after she was detained, at the time she was placed in the home of the prospective adoptive mother, she remained extremely emotionally scarred by the trauma she experienced in Crystal's care. Once in her current placement, her emotional health improved, she began to catch up to her own grade level at school and she formed a close parent-child bond with her caregiver. The emotional upheaval caused by Crystal's missed visit suggested the introduction of Jorge into her life would cause similar upheaval. Further, V.F. was strongly bonded to her half siblings, who the caregiver was committed to adopting. These facts supported the court's finding that placing V.F. on a separate track from her half siblings, one she would fear might separate her from them, was not in V.F.'s best interests.

Jorge argues it is in V.F.'s best interests to place her with her biological father, where she would be surrounded by her paternal family and new half sibling. "[A] primary consideration in determining the child's best interest is the goal of assuring stability and continuity. [Citation.] 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' " (*In re Stephanie M., supra,* 7 Cal.4th at p. 317.) Here, the trial court properly focused on V.F.'s need for stability, continuity and permanency, regardless of Jorge's wishes. (*Id*. at pp. 317-318; *In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1507.) We cannot second

guess the juvenile court's findings in this regard and conclude the court did not abuse its discretion by finding delaying permanency to allow Jorge to attempt to establish a relationship with V.F. was not in her best interests.

## DISPOSITION

The orders are affirmed.

McCONNELL, P. J.

WE CONCUR:

NARES, J.

HALLER, J.